**United States District Court**
**District of Massachusetts**

| | |
|---|---|
| Che Blake Sosa, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. |
| | ) 18-12223-NMG |
| Massachusetts Department of | ) |
| Corrections et al., | ) |
| | ) |
| Defendant. | ) |
| | ) |

**MEMORANDUM & ORDER**

GORTON, J.

Che Blake Sosa ("Sosa" or "plaintiff") filed this suit in October, 2018, when he was an inmate incarcerated at Massachusetts Correctional Institute ("MCI") Cedar Junction.  He brings constitutional and statutory claims concerning the conditions of his confinement and the purported failure of numerous prison and medical officials to accommodate his request for modified handcuffing procedures due to his osteoarthritis.

After counsel was appointed at his request to assist Sosa in this civil case, he filed several amended complaints and conducted extensive discovery.  The Department of Corrections defendants ("DOC Defendants") and medical provider defendants ("Medical Defendants") have moved for summary judgment on all

counts (Docket Nos. 205, 218, 221) and, for the reasons that follow, those motions will be allowed.[1]

## I.  **Background**

Three counts, which have not previously been disposed of, remain to be considered at summary judgment: 1) alleged deliberate indifference to a serious medical issue in violation of the Eighth Amendment by individual DOC and Medical Defendants (Count I), 2) alleged violation of the Eighth Amendment for imposition of conditions of confinement by individual DOC Defendants (Count III) and 3) alleged violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA") and the Rehabilitation Act, 29 U.S.C. § 794 by the Department of Corrections ("DOC") and DOC Commissioner Carol Mici in her official capacity (Count IV).  Sosa seeks both monetary and injunctive relief.

Sosa has been convicted of multiple counts of aggravated rape and related offenses and is currently serving the equivalent of a life sentence.  He has been in the custody of the DOC since 2001, when he was a pretrial detainee.  During

---

[1] The Department of Corrections defendants include the Department itself and Stephanie Collins ("Collins"), Michael Rodrigues ("Rodrigues"), Joann Lynds ("Lynds"), James O'Gara ("O'Gara"), Carol Higgins O'Brien ("Higgins O'Brien") and James Saba ("Saba") in their individual capacities and Carol Mici ("Mici") in her official capacity as Commissioner of the Department of Corrections.  The Medical Defendants are Vanessa Rattigan ("Rattigan"), Dr. Aysha Hameed ("Dr. Hameed") and Jenny Vieira ("Vieira").

that time, he has been found guilty of several disciplinary infractions for which he has served extensive time in the Department Disciplinary Unit ("DDU").  Sosa was housed in the DDU from June, 2003 until March, 2020 and thereafter, was moved to the Behavioral Management Unit ("BMU").  Since September, 2021, Sosa has been housed at the Souza-Baranowski Correctional Center ("SBCC").  He asserts that he was held in what amounted to solitary confinement for 23 or 24 hours each day from June, 2003 until April, 2022.  The DOC Defendants respond that housing in the DDU is not solitary confinement but rather, is a form of segregation.

Sosa has suffered from degenerative bilateral joint disease in his shoulders for over 20 years.  Because his right shoulder pain did not respond to cortisone, he underwent surgery in January, 2005 for right shoulder impingement syndrome and osteoarthritis of the AC joint.  Based on his shoulder condition, medical officials at MCI Cedar Junction issued a medical restriction against behind-the-back cuffing.

In July, 2006, Sosa stabbed two guards in an attempt to obtain their cell keys in an on-going altercation with another inmate.  The medical restriction prohibiting cuffing behind the back was discontinued and other security precautions were imposed, including the use of the MCI Cedar Junction tactical response team whenever Sosa was allowed to leave his cell.

In September, 2019, after a hearing on Sosa's pro se motion for a preliminary injunction, this Court ordered DOC to retain an independent doctor to examine plaintiff.  After that examination, an analysis of Sosa's severe osteoarthritis (detailed in the so-called "Elman Report"), subsequent hearings and DOC participation, a modified handcuffing procedure was implemented.

In March, 2020, plaintiff filed another motion which this Court treated as a motion for a preliminary injunction, and which ultimately resulted in the manufacture and use by the DOC of double-length handcuffs for Sosa.

In September, 2020, a physician's assistant, retained to make an independent assessment, concluded that the custom cuffs alleviated Sosa's pain to a certain extent.

This Court found that the custom-designed cuffs represented a reasonable accommodation of plaintiff's medical condition. Accordingly, it denied the motion for a preliminary injunction but directed the DOC to continue using the modified restraints indefinitely.  Plaintiff appealed the order to the First Circuit Court of Appeals ("First Circuit") which ultimately affirmed it in August, 2023.

In July, 2023, the Court allowed plaintiff to file a second amended complaint.  Both the DOC and Medical Defendants answered the complaint and now move for summary judgment.

II.  __Motions for Summary Judgment__

   **A. Deliberate Indifference**

   In Count I of the Second Amended Complaint, plaintiff alleges that individual Medical and DOC Defendants violated his Eighth Amendment rights by requiring him to wear behind-the-back handcuffs.[2]  He contends that the maintenance of such a cuffing procedure until 2020 constitutes deliberate indifference to his osteoarthritis.

   Plaintiff seeks both injunctive and monetary relief.  This Court and the First Circuit have, however, sufficiently considered the propriety of Sosa's modified restraints that have been used since February, 2020. See Sosa v. Massachusetts Dep't of Corr., 494 F. Supp. 3d 37, 38-39 (D. Mass. 2020) ("Sosa II") aff'd, 80 F.4th 15 (1st Cir. 2023).  Accordingly, insofar as plaintiff seeks to recover damages for the modified restraint procedure in place since February, 2020, his claim is without merit.  To the extent Sosa seeks to require defendants to continue using the custom-designed cuffs permanently, that motion has already been allowed.

   Now, the Court is asked to decide whether Sosa is entitled to monetary damages for the conduct of the individual defendants in restraining Sosa in behind-the-back cuffs from October, 2015,

_____

[2] All individual defendants except for Saba and Mici are included in Count I.

the earliest date within the limitations period, until February, 2020.

The Eighth Amendment, as made applicable to the states through the Fourteenth Amendment, proscribes the "unnecessary and wanton infliction of pain...repugnant to the conscience of mankind." Estelle v. Gamble, 429 U.S. 97, 105-06 (1976) (internal quotations omitted).  Accordingly, states have an obligation to provide inmates with adequate medical care. See Wittkowski v. Levine, 382 F. Supp. 3d 107, 113 (D. Mass. 2019) (citing Estelle, 429 U.S. at 103).

To prove a state actor has failed to comply with that obligation, an inmate must establish both an objective and subjective prong. See Kosilek v. Spencer, 774 F.3d 63, 82 (1st Cir. 2014) (en banc).

To satisfy the objective prong, an inmate

> must establish that he had a serious medical need[ ]
> for which the defendants provided inadequate care.

Lazarre v. Massachusetts Dep't of Corr., 2024 WL 111996, *5 (D. Mass. Jan. 9, 2024) (quoting Snell v. Neville, 998 F.3d 474, 494-95 (1st Cir. 2021) (internal quotations omitted) (alteration in original)).  However, "a serious medical need does not require that an inmate receive the best possible treatment that money can buy." Perry v. Roy, 782 F.3d 73, 78 (1st Cir. 2015) (quotations and citations omitted).

The subjective prong requires a showing that prison administrators were deliberately indifferent to plaintiff's serious medical need.  Such indifference comprises a "narrow band of conduct...and requires evidence that the failure in treatment was purposeful." Kosilek, 774 F.3d at 83.  The obvious case of deliberate indifference is denial of treatment to punish an inmate. Id.  However, wanton disregard of a medical issue may also constitute deliberate indifference if it is "akin to criminal recklessness, requiring consciousness of impending harm, easily preventable." Id. (quoting Watson v. Caton, 984 F.2d 537, 540 (1st Cir. 1993) (internal quotations omitted)).  In addition, security interests which are fundamental to the operation of a prison facility are accorded significant weight. Id. (citing Battista v. Clarke, 645 F.3d 449, 453 (1st Cir. 2011)).

Here, the First Circuit has noted that the restraint procedures in dispute in this case debatably "qualify as medical care." Sosa v. Massachusetts Dep't of Corr., 80 F.4th 15, 26 (1st Cir. 2023).  Nonetheless, that Court determined to proceed under the deliberate indifference standard for medical care because it found Sosa's claim for injunctive relief was deficient even taking the "framing on its own terms." Id.

This Court will do likewise.  It will assume without deciding that plaintiff's osteoarthritis in his shoulder

-7-

constitutes a serious medical condition.  Nonetheless, the Court finds that no genuine issue of material fact remains because defendants have sufficiently demonstrated that they did not act with wanton disregard of plaintiff's medical needs.

The parties only briefly discuss the second component of the objective prong, namely, whether the care provided was objectively inadequate.  The Court recognizes that the question is difficult to answer because restraint procedures are not, in fact, a form of medical care at all.

### 1. Vanessa Rattigan

During the events at issue, Vanessa Rattigan was the administrator in charge of running the prison's medical unit. One of her duties was to advocate on behalf of inmates before medical providers but, even though she is a registered nurse by trade, she did not provide medical care to inmates.

Plaintiff blames Rattigan for 1) the denial of his ADA accommodation request and 2) providing insufficient documentation to ADA Coordinator James O'Gara, who reviewed her denial.

At some point, Sosa submitted an ADA accommodation request to modify his cuffing procedure.  He claims that "in consultation" with a medical provider, Rattigan "opined" there was no medical basis for his request which is contrary to her deposition testimony that she believed, from a medical

standpoint, it was "probably not" reasonable to deny the accommodation request.

Rattigan retorts that, as an administrator, she had no responsibility for any medical decisions related to Sosa.  He partially concedes that point but maintains that she had "the ability to at least influence" the accommodation decision.

The Court concludes that plaintiff's allegation is too attenuated to suggest that Rattigan wantonly disregarded his medical need at the first level of ADA review.  There is no genuine issue of material fact that Rattigan was not acting in a medical capacity and that she relied on the advice of medical providers in denying the request.

Nor does Rattigan's purported deficient transfer of medical documents to O'Gara rise to the level of deliberate indifference.  Sosa appealed the denial of his ADA request to the DOC's ADA Coordinator, O'Gara.  He contends that the appeal was denied because Rattigan sent O'Gara only the latest medical record from his most-recent evaluation.

Rattigan rejoins, and plaintiff does not deny, that she advocated for plaintiff to O'Gara by suggesting that further evaluations were warranted and that she would send along additional information related to "x-rays, MRIs, etc.," if requested.

Far from constituting evidence of indifference, the undisputed facts suggest that Rattigan appropriately carried out her administrative role by providing O'Gara with the relevant information concerning Sosa's recent medical history and offered to provide more documentation upon request.  Even taking as true his contention that Rattigan should have initially provided more medical documentation, her actions fall far short of demonstrating "criminal recklessness, requiring consciousness of impending harm, easily preventable." Kosilek, 774 F.3d at 83.

### 2. Dr. Ayesha Hameed

Dr. Ayesha Hameed was the Medical Director of the facility and was responsible for an array of patient care functions as well as for the supervision of other providers.  Sosa contends that she was deliberately indifferent to his osteoarthritis by not recommending a change in cuffing procedures despite her awareness of his condition.

Dr. Hameed responds that she made a reasonable evaluation in April, 2016 that Sosa did not need front handcuffs based upon a "bilateral gross exam" during which Dr. Hameed observed no muscle atrophy, erythema or tenderness on palpitation.  She did observe "normal reflexes bilaterally" and she learned that plaintiff engaged in a number of exercises, including push-ups and pull-ups.  Nonetheless, in April, 2016, she ordered x-rays

and referred plaintiff to an orthopedist, but plaintiff refused
to keep the appointment.

Sosa contends that 1) Dr. Hameed's medical assessments were
irrelevant to treating his osteoarthritis, 2) his push-ups and
pull-ups are not valid indicators of his pain while in behind-
the-back restraints and 3) he refused the orthopedist consult
because it would have required him to use the rear restraints
while traveling to and from the consultation.

His contentions are unavailing.  The case law establishes
that

> prison officials are not required to render ideal
> care, let alone cater to an inmate's preferred
> healthcare regimen.

Snell, 998 F.3d at 495.  The propriety of Dr. Hameed's response
is not based on an objective analysis of medical necessity but
rather, on "what was known and understood by prison officials in
crafting their policy." Kosilek, 774 F.3d at 91.
There is no genuine issue of material fact that Dr. Hameed took
affirmative measures to aid Sosa in his medical condition.  She
evaluated him and made observations that, in her medical
judgment, rendered a change in cuffing procedure unnecessary.
Sosa's insistence that the Court second-guess her medical
judgment is rejected.  He has produced no evidence suggesting
Dr. Hameed subjectively believed her response to plaintiff's
condition was insufficient nor that she acted with wanton

disregard in light of her evaluation of plaintiff, her order of x-rays and her offer to refer plaintiff to an orthopedist.

### 3. Jennifer Vieira

Jennifer Vieira was a nurse practitioner at the prison facility who evaluated Sosa's shoulder pain.  The thrust of his claim against Vieira is that she, like Dr. Hameed, did not prescribe a change in cuffing procedure in light of Sosa's osteoarthritis and complaints of pain.

In moving for summary judgment, Vieira contends that she 1) reviewed plaintiff's most recent medical records, 2) offered an evaluation in which Sosa refused to participate, 3) ten months later, evaluated plaintiff beside his cell and 4) post-evaluation, offered plaintiff an orthopedist referral and ordered x-rays.

Sosa insists that the evaluation was insufficient because Vieira purportedly did not review his entire medical record and that, in any event, his subjective complaints of pain more than established his need for a cuffing modification.  Furthermore, plaintiff contends that requiring him to wear behind-the-back restraints while being transported to and from the evaluation presented an unfair Hobson's choice.

Sosa's contentions are once again unavailing.  Vieira has adduced undisputed evidence that she took affirmative steps to treat his medical condition appropriately.  The Court will not

second-guess Vieira's medical judgment and notes that the
parties do not dispute that the 2012 record stated that rear-
cuffing would not cause further damage to plaintiff's shoulder
despite causing him some pain.  Because any description of pain
is subjective, it was not unreasonable for Vieira to recommend
an orthopedic evaluation before recommending a cuffing
modification.

While the evaluation itself was delayed for an extended
period of time following plaintiff's purported refusal to submit
to rear-cuffing, that delay was understandable based on
plaintiff's history of violence against members of the facility
staff. See Battista, 645 F.3d at 454 ("security considerations
also matter at prisons...and administrators have to balance
conflicting demands.").

Ultimately, Vieira evaluated Sosa, referred him to an
orthopedist and purportedly ordered x-rays.  The Court concludes
that, far from displaying deliberate indifference toward Sosa,
Vieira afforded sufficient care to plaintiff's medical
condition.

### 4. DOC Defendants

The DOC Defendants also move for summary judgment on Count
I, asserting a defense of qualified immunity.  In assessing the
application of qualified immunity, a court must determine
whether 1) "the facts alleged or shown by the plaintiff make out

a violation of a constitutional right" and if so, 2) whether
that right was clearly established at the relevant time.
Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2024).

    The DOC Defendants collectively assert that they

        had not been informed by any medical professional that
        Sosa had a condition for which modification to cuffing
        was needed

until the January, 2020, issuance of the Elman Report.  They
also contend that, as a general matter, they rely on the
opinions of medical professionals in making modification
decisions.  Finally, the DOC Defendants explain that there were
strong penological reasons for Sosa's cuffing procedure prior to
2020.

    Sosa asserts that each of the DOC Defendants was, at a
minimum, aware of his shoulder condition and did nothing to
alleviate his pain or modify his cuffing procedure.  It is well
established, however, that prison officials "are entitled to
defer to medical personnel on medical questions." Snell v.
Descoteaux, 2022 WL 813831, at *5 (D. Mass. Mar. 16, 2022)
(internal quotations omitted).

    There is no genuine issue of material fact that DOC
Defendants acted reasonably in deferring to the judgment of
medical professionals that Sosa had not established a sufficient
medical need for modification of his cuffing procedure prior to
the Elman Report.  Plaintiff contends that O'Gara misrepresented

-14-

Rattigan's position as to there being no medical necessity for the modification and erroneously relied on that misrepresentation in denying plaintiff's appeal.  Rattigan was not, however, a medical provider, and the record suggests that DOC medical providers did not recommend a modification prior to the Elman Report.

Notably, DOC Defendants acted promptly to accommodate plaintiff following issuance of that report, which provided an independent and objective basis for an accommodation.  The undisputed facts establish that the DOC Defendants did not act with an intent to punish plaintiff or with a mental state akin to criminal recklessness in denying his request for accommodation prior to the issuance of the Elman Report. Kosilek, 774 F.3d at 83.

Furthermore, DOC Defendants were aware that plaintiff posed a serious security risk following multiple acts of violence against DOC personnel.  Because of those security concerns, any pain plaintiff experienced while in rear restraints was not "easily preventable." Id.

Accordingly, DOC Defendants did not violate plaintiff's constitutional rights and thus are entitled to qualified immunity and summary judgment on Count I.

**B. Conditions of Confinement**

Sosa alleges § 1983 claims against the DOC Defendants as well as Rattigan arising out of his isolation in the DDU. He contends that, in addition to exacerbating his shoulder issues, his isolation caused severe psychiatric symptoms, including suicidal ideation. Accordingly, he was frequently placed on mental health watch in the DDU's "D Wing" adjacent to the Health Services Unit.

The Eighth Amendment prohibits conditions of confinement that lack any penological justification. See Rhodes v. Chapman, 452 U.S. 337, 346 (1981). A condition of confinement claim pursuant to the Eighth Amendment requires plaintiff to demonstrate that 1) objectively he was treated in a manner that risked excessive harm to his health or safety and 2) subjectively defendants showed deliberate indifference to those risks. See Feijoo v. Mass. Dep't of Pub. Safety, 62 F.Supp.3d 198, 201 (D. Mass. 2014) (citing Farmer, 511 U.S. at 834).

**1. Injunctive Relief**

It is unclear whether Sosa seeks injunctive relief as to the conditions of his confinement. He was removed from the DDU to the BMU, a unit specifically created to provide an alternative placement for DDU inmates who suffer from a severe mental illness ("SMI"). He was then moved from the BMU to SBCC in September, 2021, where he now has "access to a window,

-16-

canteen [and] a computer tablet for reading." Because plaintiff suggests he is no longer under the conditions that form the basis of Count III, injunctive relief is unwarranted and summary judgment on Count III will be entered in favor of Commissioner Mici who is sued only in her official capacity. As already discussed, however, the DOC is obligated pursuant to the Court's October, 2020, order, to use the custom-designed cuffs on plaintiff indefinitely in lieu of standard behind-the-back restraints.

### 2. James Saba

Defendant James Saba contends that he left his position as Superintendent of MCI Cedar Junction in October, 2015, for medical leave and never returned. Thus, he did not participate in any of the alleged relevant events. While Sosa does not dispute that Saba began medical leave in October, 2015, he asserts that Saba was still in contact with DOC administrators during his absence and that, in any event, the statute of limitations should be equitably tolled.

Accepting plaintiff's version of events for the sake of argument, merely communicating with and advising staff while on leave is insufficient to raise a triable issue concerning liability for Sosa's conditions of confinement. Critically, plaintiff does not assert that Saba specifically advised on Sosa's conditions of confinement while on leave.

-17-

Furthermore, there is no basis for tolling the limitations period.  Equitable tolling is only available in exceptional circumstances.  See Martin v. Somerset Cty., 86 F.4th 938, 944 (1st Cir. 2023).  There is an open question of law as to whether equitable tolling of § 1983 cases is governed by federal or state law, see id. at 944-45, however, plaintiff's attempt to avail himself of that doctrine fails in either event.

Under both state and federal law, equitable tolling is a rare exception, not the rule.  On Sosa's telling of events, he was incapacitated and in isolation at the DDU from 2015 until at least 2019 or 2020.  He filed this suit, pro se, in 2018 under the same conditions.  This is not an extraordinary case where tolling is warranted and accordingly, Saba is entitled to summary judgment.

### 3. Stephanie Collins

During the relevant time period, Stephanie Collins was Assistant Deputy Commissioner for Clinical Services.  In that capacity, she asserts she was only generally aware of the DDU and did not know the specifics of Sosa's conditions of confinement.  Rather, her role was to ensure continuity of health services for Sosa when he was transferred to the DDU.

The undisputed evidence reveals that Collins had no role in determining or maintaining the conditions of Sosa's confinement that form the basis of Count III.  Accordingly, Collins has

-18-

sufficiently demonstrated that she did not wantonly disregard excessive risks to Sosa's health.  She is entitled to summary judgment.

### 4. Michael Rodrigues

Michael Rodrigues was Superintendent of the prison facility from March, 2016 to November, 2017.  He contends that 1) Sosa was appropriately placed in the DDU during that time due to a continued pattern of infractions and 2) Sosa was at times placed in the "D Wing" of the DDU on the advice of medical experts.

The undisputed evidence establishes that Sosa was in the DDU when Rodrigues became Superintendent and that during his short stint as Superintendent, Sosa incurred 32 disciplinary actions for which he was found guilty and faced sanctions. While the misconducts varied in severity, at least some involved acts or threats of violence.

Furthermore, evidence that Rodrigues had frequent discussions with Sosa about his behavior but that Sosa self-sabotaged his progress suggests that Rodrigues was not deliberately indifferent to Sosa's conditions.  Finally, the Court finds that Rodrigues appropriately deferred to medical personnel concerning mental health issues arising from Sosa's placement in the "D Wing."

### 5. Carol Higgins O'Brien

Former DOC Commissioner Carol Higgins O'Brien, who was commissioner from September, 2014, to April, 2016, contends that she was not personally aware of Sosa's shoulder pain or his mental health diagnoses.  Furthermore, she asserts that she never received correspondence from Prisoners' Legal Services concerning Sosa, and that, as is customary at DOC, any such correspondence was processed by administrative staff.

The Court agrees that plaintiff has failed to adduce evidence demonstrating that Higgins O'Brien had any personal involvement in the alleged events.  Accordingly, summary judgment will enter as to Higgins O'Brien on Count III.

### 6. Vanessa Rattigan

As discussed above, Rattigan was the administrator in charge of the prison's medical unit.  She contends that she had nothing to do with Sosa's conditions of confinement and he has proffered no evidence to the contrary.

Most of plaintiff's allegations directed against Rattigan have already been addressed.  While Sosa alleges that Rattigan was aware of his conditions of confinement and took no action, there is no evidence that she had any control over those conditions.  The undisputed evidence indicates that Rattigan did not act with wanton disregard towards any purported excessive risk to Sosa.

### C. ADA and Rehabilitation Act Claim

Finally, plaintiff seeks relief under the ADA and Rehabilitation Act to enjoin the DOC from 1) employing any "restraint technique that requires manipulating Mr. Sosa's shoulder joints beyond the limitations of their mobility," 2) housing Sosa in isolation or 3) limiting his access to programming, education, recreation and social opportunities. To the extent that plaintiff seeks to recover damages, the claim is barred by sovereign immunity.  Title II of the ADA ("Title II") abrogates state sovereign immunity only to the extent that state conduct violates the Fourteenth Amendment.  See United States v. Georgia, 546 U.S. 151, 158-59 (2006).  As discussed above, the Court finds no such violation.

With respect to injunctive relief, Title II provides that

> no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12131.

To state a prima facie case under Title II, a plaintiff must demonstrate he or she 1) is a qualified person with a disability, 2) was "excluded from participation in, or denied the benefits of a public entity's services, programs, or activities or was otherwise discriminated against" and 3) was excluded, denied benefits or discriminated against because of

-21-

his or her disability. <u>Snell</u>, 998 F.3d at 499 (quoting <u>Kiman</u> v. <u>N.H. Dep't of Corr.</u>, 451 F.3d 274, 283 (1st Cir. 2006)).

### 1. Cuffing Procedures

Sosa's claim with respect to cuffing procedures is based on a reasonable accommodation theory.  The Court has already determined that the double-length, custom-designed handcuffs used on Sosa represent a reasonable accommodation of his osteoarthritis.  That determination is based on the Court's assessment that the double-length cuffs "avoid[] a substantial risk of causing Mr. Sosa undue harm while still allowing the DOC to maintain safety and security for its officers." <u>Sosa II</u>, 494 F. Supp. 3d at 38-39.  The order and its underlying rationale were affirmed by the First Circuit.[3] <u>Sosa</u>, 80 F.4th at 32-33.

While the Court's initial determination was made with respect to a motion for a preliminary injunction, Sosa has not proffered any further evidence that would withstand summary judgment.  The Court notes, however, that its October, 2020, order compels DOC to use the custom cuffs indefinitely.  Accordingly, the motion for summary judgment on Count IV as to cuffing procedures will be allowed.

---

[3] The First Circuit also noted that plaintiff's framing of his requested remedy within the context of ADA reasonable accommodation analysis was a "poor fit."

### 2. Isolation

Plaintiff also seeks to enjoin DOC policies concerning his isolation and concomitant restriction from programming, recreation and other social activities on account of his SMI.

The DOC moves for summary judgment, contending that Sosa 1) never sought a reasonable accommodation to be moved out of DDU placement, 2) was not identified as having an SMI until July, 2019, after which point he was removed to the BMU and 3) was provided the same services as other inmates in the DDU. Furthermore, there is no evidence in the record demonstrating that Sosa was denied access to services by reason of his disability.

As discussed above, Sosa is no longer housed in the DDU or BMU but resides, instead, at SBCC.  To the extent that he chooses to pursue a claim for injunctive relief under the ADA, there is no evidence that the SBCC provides Sosa with inadequate services on an unequal basis from other inmates housed there.

Finally, the parties do not address in their memoranda plaintiff's requests that the Court enjoin defendants from 1) discriminating against Sosa on the basis of his disabilities, 2) interfering with the present action or 3) retaliating against him for bringing the present action.  The Court has an obligation to assess its subject matter jurisdiction and finds that those requested remedies are not redressable in this forum.

See In re Recticel Foam Corp., 859 F.2d 1000, 1002 (1st Cir. 1988).  Plaintiff is asking, in effect, for an order directing defendants to comply with the law.  There is no necessity to enter such an order because the DOC is required to do so in any event. See Los Angeles v. Lyons, 461 U.S. 95, 108-09 (1983) (finding plaintiff lacked standing to enjoin city police officers from illegally restraining plaintiff in the future).


## ORDER

For the foregoing reasons, the motions of defendants Vanessa Rattigan, Dr. Ayesha Hameed and Jennifer Vieira in their individual capacities for summary judgment (Docket Nos. 205 and 221) and the motion of defendants the Massachusetts Department of Corrections, Stephanie Collins, Michael Rodrigues, Joann Lynds, James O'Gara, Carol Higgins O'Brien and James Saba in their individual capacities and Commissioner Carol Mici in her official capacity (Docket No. 218) are **ALLOWED.**
**So ordered.**


  /s/ Nathaniel M. Gorton

  Nathaniel M. Gorton
  United States District Judge


Dated:  March 30, 2024

-24-